Case number 13-3940 DuPont Juvenile v. Juvenile v. Target Corporation Good morning. Could we have counsel who are going to present approach the podium and identify yourselves, please? Good morning, Your Honor. I'm Jay Leskowitz. I'm with the appellant. Your Honor, September 4. I'm with the appellant. Very well. Well, at the outset, we always say we're going to give you a decisive 15 minutes, but we never really hold to that. But I assume that you'll want to preserve some of your time for referrals, right? That's correct, Your Honor. All right. Very well. Thank you. Whenever you're ready, counsel. Thank you. Good morning, Your Honor. And I would like to reserve a few minutes for rebuttal and take whatever questions before that as well. Let me ask you this. Does the Messing Bartlett precedent apply to the plaintiff's claims here? It does, Your Honor, and I wanted to begin with that because the case, when it was keyed up and briefed below before the trial court, was briefed prior to the Bartlett case being decided after the Messing case was decided. And, in fact, the plaintiff's opposition to the motion to dismiss makes very clear that they were relying expressly on the First Circuit decision in the Bartlett case in which the First Circuit Court of Appeals carved out an exception, read the Messing case narrowly, and said, we understand that the Messing case applies to warning claims. The drug should have had a different warning which would have made it safer, and if that was the extent of the claim, then the First Circuit acknowledged that Messing preempted that. But what the First Circuit said, and this is what was briefed, and, in fact, the plaintiffs, at page 9 of their brief, say the facts in this case are directly identical to the facts in the Bartlett case, and they were urging the court to adopt the First Circuit's rule. And what the First Circuit has said is, notwithstanding the Supreme Court's Messing case, if the challenge is… I want to ask you, the certified questions, the way they're posed, phrased, okay? They're listed in your brief. Now, is it your understanding that we're looking at the actual complaint here that was filed, or is this some other general question that the court's searching? Well, Your Honor, obviously, the complaint is the operative document. That is the framework for which the plaintiffs have framed their allegations, what they are alleging here. But what the Supreme Court made clear in Messing and in Bartlett, and now what every single court to have addressed this issue in the country has addressed post-Bartlett, is that all of the traditional state tort law claims with respect to a generic drug company are, in fact, preempted. Now, I mean, isn't that kind of a general statement? Isn't it about a failure to warn that that is clearly preempted? Actually, Your Honor, respectfully… And a defect design where the generic manufacturer can't really change the makeup, and it can't change the warning. Well, Your Honor… That makes it preempted for a generic maker because of their requirement that they be the same as the manufacturer. That is correct. But if I may be heard, Your Honor, there are only three conceivable options for a drug manufacturer. A generic? For a generic. There are only three conceivable courses of action if a plaintiff sues and says, I took a drug, I had a terrible reaction, I had a terrible injury. One possible course of action would be to change the warning. To warn and to say, this drug has some terrible side effects, big bold letters, don't take it, and a stronger warning might be a defect. But a generic can't do that. Correct. The second option would be to change the design of the drug itself. And a generic can't do that. So the only other conceivable thing a generic drug company could do is to withdraw the drug from the market, to stop selling the drug, because it can't change the warning and it can't change the molecule. And what the Bartlett case addressed expressly with that third option, and in fact, the way it was framed to the Supreme Court in Bartlett, and I'm reading from page 39 of the Bartlett brief to the Supreme Court, which is exactly the argument being made here. It says, where liability is imposed for selling an unreasonably dangerous product that can't be improved through design change or a label, a manufacturer's decision to remove the product doesn't conflict with any federal law. If a state strict liability law imposes a duty on the manufacturer to withdraw an unreasonably dangerous drug, nothing in federal law preempts that decision. That was the argument that went to the Supreme Court. The argument was, preemption is about impossibility. Is the brief that you cite in the record? You referred to their brief. Is it in the record? I don't know if it's in the record. Weren't you just reading from it? I was reading from the brief that was – I was arguing, Your Honor, I was trying to show the Court how this is the identical argument that the Supreme Court addressed. Yes. And certainly the Court can take note of the Supreme Court's precedent, which we do not – How clearly, though, did the Supreme Court address that argument? They addressed it – No. They couldn't have been more clear. What the Supreme Court said is, and I'm quoting from page 2478 of the Supreme Court decision in Barclays, We redress this stop-selling rationale as incompatible with our preemption jurisprudence. Our preemption cases presume that an actor seeking to satisfy both his federal and state law obligations is not required to cease acting altogether in order to avoid liability. Indeed, if the option of ceasing to act defeated a claim of impossibility, impossibility preemption would be all but meaningless. And in fact, the example that Justice Alito gave during the argument, when he asked the plaintiff's counsel, he said, I understand you're telling me that it's not impossible for the drug company to cease from acting, and therefore there shouldn't be preemption. And the counsel acknowledged that. Let me ask you this. In Mensing, the Supreme Court said all relevant events in this case predate the Food and Drug Administrative Amendments Act of 2007. We therefore refer exclusively to the pre-2007 statutes and regulations and express no view on the impact of the 2007 Act. But by contrast, in this case, all relevant events postdated the 2007 Act, didn't they? Of course they did. Well, the drug approval and the labeling do not. But the Mensing comment about whether it's pre- or post-fida has nothing to do with the preemption analysis. And the Bartlett Court made very clear that there is no answer to preemption to say that a company that is authorized to engage in commerce can, because the state imposes a different or stronger duty than the federal government, take the product off the market. That's not an answer to preemption. But that's not the issue, because in the 2007 Act, generic manufacturers were required to provide stronger labeling if it was warranted. No, Your Honor, respectfully, that's not correct. The generic drug manufacturers, unlike the brand manufacturers, are never allowed to incorporate stronger or different warnings. If the FDA ordered it? If the FDA ordered it, then absolutely. But there is no contention, Your Honor, in this case, that there was a directive by the FDA that the companies at issue here did not comply with. So if that was a claim here, that would be a very different kind of case. Okay, but they did add that in there, that if the FDA would unilaterally order it, does Congress remove at least one of the reasons relied by the Supreme Court in support of preemption? That was with respect to brand drugs, Your Honor. What was going on in that case was the Court was distinguishing Mensing from Wyeth, which came before it, and Wyeth was a brand case. And prior to those amendments, if the FDA wanted to order a generic to change the label, it first had to direct the brand to change the label, and then the generic would follow. May I ask you, does the misbranding statute apply in any way, shape, or form? Federal misbranding statutes apply at all to generic drugs? It does not apply as a defense with respect to preemption. Obviously, if their federal government believes that a drug is misbranded, whether it's a generic drug or a branded drug, the federal government certainly can bring an action. And the statute, the FDCA at Section 337A says those actions may only be brought by the federal government. There's no private right of action. For misbranding? Correct. There's no private right of action for misbranding. Well, what did the Supreme Court mean then? How would you interpret that footnote of theirs for, where it says, we do not address state design defect claims that parallel the federal misbranding statute. And then they go on and say what the statute requires. It says that even a, that a manufacturer is required to pull an FDA-approved drug from the market when it is dangerous to health, even if used in the dosage, the manner, or the frequency and duration prescribed, recommended, or suggested. And then the court keeps going on. The parties in the government appear to agree that a drug is misbranded under federal law only when the liability is based on new and scientifically significant information that was not before PFDA. What did they mean by that footnote? They were responding to an argument, and the Sixth Circuit, I would commend to Your Honor, the Sixth Circuit Court of Appeals' decision in the propoxetine case where this was addressed by the court. I'll let the court read the opinion. But what the Supreme Court was addressing there was an argument made by the Solicitor General in the Bartlett case in which the court, the Solicitor General was saying, let us assume, Your Honor, that there is a jurisdiction in this country that has an absolute liability jurisdiction, not a common case jurisdiction, not a jurisdiction where warnings could play a role, but a warning where there is absolute liability. And we're not aware of any such jurisdiction. That's what the Solicitor General said. And certainly Illinois is not one because we know Illinois is a common case. But if we had such a jurisdiction where if a drug, irrespective of the warning, was deemed to be unreasonably dangerous, and if the plaintiff in their complaint had shown that there was evidence that the FDA did not have access to, then the Solicitor General was arguing that there might be cause for a parallel claim. And the Supreme Court said... Would that be a private right of action or not? Well, under the Solicitor General's perspective, I think it would be. The Supreme Court said we don't need to address that in the footnote because it's not relevant here. Is there anything in that footnote that impacts the decision that we're making? Absolutely not for two reasons. Actually, three reasons. Number one, this is a common case jurisdiction. So by definition, what it means for a drug to be unreasonably dangerous in Illinois, Lawson v. Searle is the leading common case case by the Supreme Court here, but it's well established in the plaintiffs at pages 18 and 19 of their brief, agree that it's a common case jurisdiction. That means that you have to see whether the warning is sufficient. So the warning, by definition, impacts whether it's unreasonably dangerous, and we know from the Supreme Court that if there's a warning-based claim, it's not relevant. Don't the plaintiffs both claim that, sorry, the plaintiffs claim that the two previous cases with generics involved a duty not to sell the drugs without adequate warning. Isn't that how they separate themselves from that? And that's the same in Illinois. In other words, there is no Illinois cause of action that says you can't sell a drug that's unreasonably dangerous irrespective of the warning. So what it means to be unreasonably dangerous under Illinois law is if you don't have a proper warning. But can a drug actually be unreasonably dangerous regardless of the warning? Isn't that really what happened with this particular drug? The FDA came out and said no longer, we are not going to allow the sale of this because it is unreasonably dangerous no matter how you warn the consumer. Isn't that what they did? Well, actually, Your Honor, that's not what they did at the relevant time. In other words, what the FDA did, the plaintiffs here took this drug for six months in 2010, before the FDA took the drug off the market. And what the FDA said shortly before the plaintiffs started taking the drug, before it was prescribed by the doctor, was based on all of the information that it had, adverse reports from every manufacturer said, and I quote, initiating the withdrawal of protoxepine products in the United States is not appropriate at this time because the overall risk-benefit profile remains favorable. So what they were saying, and the plaintiffs are simply trying now to second-guess the FDA's determination, which, of course, the Bartlett case makes clear is not appropriate. If we had been marketing this drug after the FDA had made a decision that it was unsafe, it would be a very different story. And then that might very well give rise to the kind of parallel claims that you're talking about. But what happened here was the FDA had the information, and they actually directed the brand manufacturer to conduct additional studies, and then said, during this period, it's not appropriate to withdraw the drug. Right, but at some point after the fact. And correct. And is that what you really think this case hinges upon, is that the drug became unreasonably dangerous? I mean, that's not the right phrase. At some point in 2010, the FDA said that we no longer are going to permit the sale of this drug because it is unreasonably dangerous, and no warning could fix it. And once the FDA made that decision, then no drug company, generic or brand, would be entitled to sell the drug. And if they did, I think they would be subjecting themselves to exposure. But is there an action that could have survived if it alleged that the drug was always unreasonably dangerous, that everyone already knew that it was unreasonably dangerous, no warning could really fix that, and therefore they should have stopped selling it before? So the answer is no for two distinct reasons. One, because as a matter of Illinois law, to bring that claim, to have a cognizable claim under Illinois law that a drug is unreasonably dangerous, it actually means that there wasn't a sufficient warning. There is no cause of action for absolute liability. What Illinois case holds that? The Illinois court case that holds that. The leading case, the first case, is the case I mentioned, Lawson v. Serow, 356 NE 2nd 779. Was it decided on that premise? Well, yes, it was. And Kirk v. Michael Reed Hospital and Medical Court, 117 Illinois 7507, says, quote, a prescription drug may be deemed unreasonably dangerous because of the absence of an adequate warning accompanying the product, as the product may be avoidably unsafe without such a warning. But all drugs are inherently dangerous. And the theory behind comments say is that without a proper warning, any drug can be dangerous, but the way you measure whether the drug is unreasonably dangerous is looking at the warning. But the second part, which is the factual part, is the plaintiffs nowhere allege in their complaint that there were facts that were not known to the FDA at the time of the approval and at the time of the continuing decision in 2009 to continue to direct the companies that they could continue to sell. There is no factual allegation at all. All right, well, would you say that this report of the expert that they have who said he did a study in 2006 saying that it was unreasonably dangerous, that that was before the FDA, or it was something that- It was before the FDA, and indeed, what was also before- Does the record suggest that that report or reports like that were before the FDA at that time? Yes, the FDA's own records show that not only did they have all of the adverse reports, but they had studies because the European Drug Authority- In 2005 or 2006? What year? In Great Britain in 2009? 2006. And so the FDA was very focused on this drug. They knew that there had been questions raised about the safety profile of the drug, and yet they had made the determination as late as the summer of 2009 to direct Xanadine, the brand manufacturer, to conduct additional studies because initiating the withdrawal was not appropriate from a health perspective. Okay, I want to go back to what I asked you initially. I need to have this resolved by both sides, and that is this. Is it your understanding that the way these questions were certified is that we are looking at the complaint that is before us and no other? That is correct. We are not- So is it your understanding that the certified questions are asking whether each of the counts can survive the Supreme Court's decision in the Bartlett and Messing cases based upon the allegations in the complaint, in the First Amendment complaint, that is here and nothing else? I think that that is- I can't speak for the judge who certified the question. I think that that is- that was what the judge was asking this court to decide, although I would suggest, Your Honor, that it actually doesn't matter because the decision that I believe this court should make, in light of the precedent from Bartlett and Messing, is that as a matter of the supremacy clause of the United States Constitution, there is no viable claim for any of the common law clauses of action, for negligence, design, fraud, because all of these would have required either a change in the molecule or a change in the warning or alternatively, the company can simply take the drug off the market and a state is not entitled, under the Supreme Court's decision in Bartlett, to impose liability against the company for continuing to market a drug, even a drug that is alleged to be dangerous, if they can't change the warnings and they can't change- But would that be different if the common law of the state, or if there were, as the court points out, this absolute liability? I think if you had a jurisdiction with absolute liability and you had allegations in an operative complaint that there were new facts not before the Supreme Court, then you would have a question that the Supreme Court reserved judgment on, or else, if I just may finish, what the Sixth Circuit Court of Appeals did in a case addressing this very product, the same allegation, propositing when this case claim was made, in fact, they argued that they had alleged this so-called paranormal misbranding claim, and the- Well, the court said they hadn't really pledged. Correct. Correct. So- Well, do you believe that we have- that we should be indicating in our answer to these questions whether or not that exists out there? I don't know that this court needs to address a hypothetical claim not before this court. So is it your understanding, then, that the complaint that we have to look at is the one on file, and that it really- is there any question here that we should be answering as to whether or not there's an exception that exists for absolute liability claims? No, it doesn't exist anywhere in the United States, Your Honor. So that would be an advisory opinion. What this court is being asked to do is not render an advisory opinion, but look at the facts alleged here, and look at the precedent that applies to these concepts. And we can leave for another day in the event that some jurisdiction decides to adopt a different liability claim. Yeah, but some other jurisdiction isn't where we are. Right. Now, one of the things that the plaintiffs argue is that there's nothing in the Supreme Court's decision that in any way suggests that a drug company is precluded from pulling an unreasonably dangerous drug from the market. And that that's not- that that doesn't conflict with the supremacy case. Well, Your Honor, that is the argument that was made in- Yes, Your Honor. And I would like, if I may, just to give you the example that Justice Alito gave, because it really proves this point. He said to the plaintiffs, he said, let's just assume that a state says you are required to drive on the left side of the road. And the federal government said, you're required to drive on the right side of the road. Would the state law be preempted to avoid accidents? And the plaintiff's lawyer said, well, of course. And the judge, the justice said, but wait a minute. There's nothing obligating you to drive. You don't have to drive. And if you don't drive, then you are, in fact, not violating either the federal or the state legislation. The point of the Bartlett case was not to say that there's preemption because it is impossible to take a drug off the market. The court freely acknowledged that it was possible to take the drug off the market and that there was no prohibition against Teva or Target or any of these companies withdrawing the drug. The point of the Bartlett case was to say, when you have a situation and you can't change the label and you can't change the design, and a state is therefore saying, if you continue to sell it, we are going to hold you liable because you may freely take the drug off the market, that that's not an answer to preemption, that those claims are still preempted. And would you say that this really is a stop-selling complaint, that they're suggesting here simply that they should have stopped selling, but you're saying if you do that, then preemption is gone, it's out the window? I couldn't have said it more clearly. In fact, they bend over backwards to say, we're not alleging that they should change the design. We're not alleging they should change the warning. We know we can't let go of that. They say that this is different from Bartlett and Mensing because they are not alleging a duty not to sell, but that those cases involve a duty not to sell the drug without asking for it. That's correct, your Honor. They were right when they briefed this below and they said this is identical to the Bartlett case. What they are alleging here is that in their vernacular, because I don't think it's true to commentate, but in their vernacular they're saying this drug is just so dangerous, it shouldn't have been on the market, even during that window when the FDA said it should have been on the market, which is when our client was taking the drug, we think that this... Is that really kind of true, in light of what the FDA did? Actually, the drug was so dangerous that they said we're not going to allow it to be sold anymore. The FDA was quite a bit behind others, certainly other jurisdictions that had already pulled it and said, too dangerous, there's nothing you can do to fix this. By that standard though, your Honor, every single time the FDA orders a warning to be strengthened, there is an implicit acknowledgement that prior to that stronger warning, the drug wasn't warned properly. They put a black box warning on some drug and said this could potentially give rise to suicidal tendencies, and someone took the drug six months before the FDA made that change, you could say, well, clearly we know now that the drug should have had that warning, but the whole point is we don't second guess, as a matter of state law, the FDA's safety and efficacy determinations, and that's the essence of the preemption holding here. They are arguing that we should have taken the drug off the market and that we can be held liable for having continued to sell the drug during that time period. My understanding of the bottom line of the plaintiff's theory here is that this isn't really an impossibility situation, and that's because the impossibility preemption is based on a situation where you want to design the effect, but under federal law you can't change the design, or you want a stronger label, but under federal law you can't change the label, so therefore it's impossible to do anything. But they're saying that they're kind of an exception to, their claim is an exception to bar this rejection of the stop selling theory, because they're not saying the label should have been strengthened, and they're not saying that the design should have been changed. They're not saying either of those things, because they're saying, my understanding is that there was no design change and no label change that could have made this product safe, and therefore it's not a question of running up against the prohibition of changing the label and running up against the prohibition of changing the design, it's just that there was nothing that could be done and it should have been pulled. And that's why this is different, under their theory, this is different from Hartleff. My understanding of, I'll ask the plaintiff this, but that's what you see as their claim today, isn't it? It is, and that is exactly the claim in Bartlett. Just to read again, both from what was argued to the Bartlett court, and what the Supreme Court decides. They argued to the Bartlett court that where liability is imposed for selling an unreasonably dangerous product that can't be improved through a design or label change. Are you reading the brief again? Yes. I'm going to read how the Supreme Court responded to that. Yes. They said there is no conflict. Why? Because nothing in federal law preempts a manufacturer from withdrawing an unreasonably dangerous. So there is no conflict. That was their theory. That was their theory. It had a Supreme Court response to it. It said the option of ceasing to act, if the option of ceasing to act, preceded a claim of impossibility, then impossibility preemption would be all but meaningless. Give those two cases. Do you want to continue? No. I just want to finish my question. Would you finish answering my question? Yes. So if I may finish it. So the answer to your question is they are correct that they are not asserting in this case that we should have changed the label or we should have changed the design. They're saying we should have taken it off the market and nothing preempts taking it off the market because it's not impossible for us to take it off the market. And what the Supreme Court said is at least where a state imposes liability based on a balancing of product harms and benefits in light of its labeling, which is what comment K does, the mere fact that a manufacturer may avoid liability by leaving the market does not defeat a claim of impossibility. They have interpreted the word impossibility to mean more than just is it physically impossible because while it may be physically, well, it's not even technically physically impossible to change the design. You could change the design, but it would be legally impossible. You'd be violating the FDA. And it is equally legally impossible from a preemption perspective to say you have to take the drug off the market. You are exactly right. What about the difference that in mensing and partner, the drugs actually were never sold, they're still out there, and those issues really did relate to changing the warning? How do you respond to that? In the same way that the Sixth Circuit addressed this case, the propoxy case, at the time where the drug was taken, it was authorized by the FDA with full knowledge by the FDA of the risks and benefits. They had even made an affirmative determination that it would have been inappropriate to take the drug off the market. We can sit down with 20-20 hindsight and say maybe the FDA should have acted earlier, maybe not. I'm not a scientist and I can't make those assessments, but it would be a different story if someone were to go out and sell propoxy today. That would be a very different story. What page, where were you citing when you said that the Supreme Court actually addressed the unreasonably, the impossibility if you don't? Yes, if you read on page 2477, continuing into 2478, it's Romans 4, section 4 of the Supreme Court's opinion in Bartlett. That section explains very clearly why the stop-selling theory is incoherent in the words of the Supreme Court. The incoherence of the stop-selling becomes plain when viewed through the lens? Correct. And actually, if you go up one sentence above that, indeed, indeed, it's the option of ceasing. All right. But that's the section of the Supreme Court's opinion that is directly responsive. And this case, I believe, would have come out differently with the trial court if the trial court had had the benefit of briefing in the light of the Mensing decision. The Mensing decision, I think, came down days or a week or so before the judge rendered her opinion here, and the plaintiffs had basically made their argument that the First Circuit was correct and that this case is just like the Bartlett case. And they were right that it was just like the Bartlett case, but what happened is the Bartlett case was reversed by the Supreme Court. Let me ask you this. Sure. You said that the questions that were given to us were formulated by the trial court? I believe that that... I'm sorry. The parties formulated the questions. Okay. That's correct. And you assisted in that, did you not? Correct. Counsel. Counsel for the defendants. Okay. So when you said before that the trial court did that, you were mistaken? I was mistaken. I was not in the case below at the trial court, and I was not familiar with the process for certification. Thank you for that. One other question. Yes, Your Honor. In the 2007 Act, which, of course, came after the Mensing-Bartlett case, Congress chose not to include an express preemption provision, did they not? The 2007 Act... Let me just answer the question. Yes or no? Congress did not, and that took place before Mensing-Bartlett, Your Honor, several years before. The 2007 Act was prior to the Supreme Court. Something about the amendment. Correct. The amendment didn't come after... It came before, Your Honor. That's true. It did come before, but they did not consider it, because it was passed after the point in time. Didn't the complaints originate before the 2007 legislation? I think that's what Justice Gordon is asking. Right. I think the Supreme Court makes clear that everything that occurred predated the 2007 amendments. That is correct, Your Honor. And the 2007 amendments, though, don't change anything with respect to the legal issues here. That's what you're saying, and I do believe the plaintiffs would agree with you. Okay, but it did not include an express preemption provision. Congress could have put that in there, could they not? Yes, they could have, and the Supreme Court has made very clear that the presence or the absence of an express preemption provision has no bearing on conflict preemption. The supremacy clause. Correct. It doesn't matter what they say. Correct. In other words, Congress can put in an express preemption, it can omit an express preemption, if fundamentally there's a conflict between federal and state law, federal law is supreme. That's what the Supreme Court has made clear. Okay. I just want to get that clear. The Court has no further questions. So let me ask you this. So does the existence of new information have any bearing on your decision today, new information that was not before the FDA? I don't believe, A, I don't believe that it would make any difference as a matter of constitutional law, and, B, there's no allegation in the complaint that there was new information that the FDA did not have access to. The FDA has access to all of the adverse reports. They had access to what the European regulatory agency was doing. But isn't that only in the scenario involving this absolute liability situation as opposed to strict? Correct, Your Honor. So we're talking about something that isn't really applicable under Illinois law. Under any law. Any law in any state. Correct. Your Honor, I thought the judge was asking me about the hypothetical situation of an absolute liability regime. In Illinois, it's not relevant in any event. In Illinois, the question of design feedback, strict liability, is always premised on the adequacy of the warning, because that is the prism through which we assess whether something is unreasonably dangerous. Thank you very much, Your Honor. I'll reserve my few minutes for rebuttal. Your Honor, I'm going to ask you something about the questions that were certified. Counsel just said that they were drafted by the parties. Did the plaintiff, FLE, I thought you objected to those questions. I believe that we objected. The questions were drafted by the defendants. So when he says they were drafted by the parties, that's not true as far as you're concerned. And the questions are very general questions that Justice Johnson ultimately certified. But, Mr. Ford, do you agree that, however they're formulated, that we have to answer them vis-à-vis the complaint that is before the court? No, she doesn't ask you to. Well, then what's, I'm not sure then whether the rule would be applicable. She, well, she asks a general question, and I would say the question that she's really asking is she's saying, is there any cause of action that survives? That's the question she's asking, if you read the five questions. What she's really asking is, is there any cause of action that survived after Bartlett and Mensing? Okay, isn't that asking for an advisory opinion? Well, you know, I have to say that reading 308, I'm not sure. I've read all the Supreme Court decisions. I've read some decisions of yours, Justice DeFrey, Justice Gordon. You're supposed to answer the question. They can't be general questions. You're only to look to the complaint to the extent that the complaint, as necessary, is so associated with the question. So here you would look at the 619 motion, not the 615 motion that was also considered. And so I think, in a sense, it is an advisory opinion. But the rule doesn't envision answering anything that would be advisory, does it? Maybe it does. You tell me. I don't know. I've read the cases, and, you know, some of the cases say that the court is, that certain courts are supposed to propose general questions, not necessarily asking the court to review the complaint. Well, what is at stake in this case, then? I mean, isn't that an advisory opinion to tell you, the lawyers, on both sides, what could withstand, if there is such a complaint, it could withstand being heartless and menacing cases? I have to confess that I think you're right, as much as we're hoping you'd reach the decision and resolve it the way we suggest. But one of the things that I have to, and confessing that I think you're right on that, is that this is coming after a 615 motion. We can amend, even if Judge Johnson had ruled differently, we can amend this complaint over and over again at this stage. I mean, we're only at the initial pleading stage. So, I would say, to that extent, this case, more than some of the others that you've reviewed under 308, is looking for something close to an advisory opinion, especially the way they drafted the questions, which are very general. And their questions... Well, our cases, though, would say that if the 308 has been providently granted, that the court can then simply dismiss the appeal. You certainly can. Absolutely. And as I said, the question here is, to get to the point, to get to the issue, and to respond to some of the arguments, the question here that Judge Johnson is asking is, is there any cause of action that survives? And this case, we submit, this case does survive easily. There's complete harmony in this case between the federal regulation and the state regulation. It's a violation of the Illinois law to market an unreasonably dangerous product. It's a violation of federal law to sell an unsafe drug. But isn't, in this case, it significant that up until 2010, the FDA said that this drug was sufficient to be sold with the warnings that they had for it? Isn't that really what they had said up to 2010? And aren't we bound by that? Let me answer the entire argument this way. Let me go right to, let me skip most of what I've written, and go right to the heart of the problem. And to understand what Bartlett held, Menting doesn't say anything. Menting, there was a complete clash between what the plaintiff wanted and federal regulation. They wanted to change the label, to shorten the duration. So you had a direct impossibility. Bartlett's a different case. But to understand Bartlett, I would say, don't search what some party argued. Don't look at the briefs as to what the parties argued. Look at the arguments in the court. And it's a very interesting case that way, because you have what the court was answering, what Justice Alito, in his opinion, was answering in that brief, some of these spots when he talked about the exceptions, was not what the plaintiff wrote. It was what the dissenters were saying. Let me ask you this. Did the Menting-Bartlett precedent apply to the plaintiff's claims here? No. And I'm going to explain why in a minute. Okay. I think that's important to address. Yes. In about five minutes, I will be finished with that justice story. What I was saying was Justice Breyer, in particular, and Justice Sotomayor were hammered. They hammered this opinion. They say, do you understand what you guys are saying? They are all guys. And so Alito is responding. And then he says, for one thing, Breyer says, in certain circumstances, a manufacturer should have to stop selling. If a manufacturer has a very dangerous drug, even if the FDA said they could sell it, they shouldn't sell it. And Alito says that's not the case. But then he says, he opens the possibility at page 2, the Federal Reporter 2477. He says there's a possibility for that rare case in which state or federal law, state or federal law, requires a product be pulled from the market. Where are you reading from? I'm reading from Federal Reporter on page 2477, footnote 3.  And then Justice Alito tries to answer Sotomayor's criticism. That's in footnote number 4, which you mentioned earlier. All right. Just briefly, though, doesn't that apply only to an absolute liability scenario, which doesn't really exist in any of the states? I don't think so. Let me read what he says. We do not address. I know what it says. But in reading it, I can tell you why. We do not address state-designed effect claims that parallel the federal misbranding statute. The misbranding statute requires a manufacturer to pull even an FDA-approved drug. You're not saying this is a misbranding claim? I'm saying the misbranding statute, 21 U.S.C. section 352J, says basically a manufacturer may not sell an unreasonably dangerous product, a drug that's dangerous to health. It says they cannot sell it. But don't these cases say that as long as this product is still FDA-approved, that a generic manufacturer cannot be held responsible for continuing to sell when the FDA hasn't pulled it? I don't believe that. But that's their position, isn't it? That's the argument. Isn't their position that that way? Otherwise, there is no impossibility to comply with both the federal and the state. And Alito says that's not what we're saying. He says again, the dissent accuses us of incorrectly assuming that federal law gives pharmaceutical companies a right to sell a federally-approved drug free from common-law liability. That's what he's saying today. And he's saying that we were accused of that by the dissent. Judge Alito said, Justice Alito says, but we make no such assumption. That's at page 2479, the federal report. Then he goes on to say, the dissent is quite correct. The federal law establishes no safe harbor for drug companies. No safe harbor for drug companies. That's what Justice Alito said. He absolutely rejects the suggestion that the drug company is trying to make here today. And the case, the Sixth Circuit case that is the only case dealing with this drug. It goes back to the question that I asked earlier. And I want to ask you if I framed your position correctly. And you were just reading, I don't have the page number, but you said that the dissent is quite correct. The federal law establishes no safe harbor for drug companies, but it does prevent them from taking certain remedial measures. My understanding of your claim is that there are no remedial measures that would satisfy the plaintiff because the drug is just inherently dangerous and can't be made safe. And therefore, there isn't an impossibility conflict because you're not asking them to do the things that they can't do. That's correct. We're not suggesting that this drug should be taken off the market. It's off the market. The point you were just making, Justice Palmer, Justice Alito at that point, stresses the limits of their decision. It places a duty on manufacturers to render it. He says they are limiting their decision to where the state places a duty on the manufacturer to render a drug safer by either altering its composition or altering its labeling. We're not asking that they alter their composition or alter their labeling. We're saying this is an effective drug that never should have been sold. Now, as to the Sixth Circuit case, I think, Justice McBride, you pointed out that that court clearly said that there could have been a footnote 4 case fled here, but they didn't adequately plead it. But the case, I think, clearly suggests that in our situation, in our situation you could plead a case, a misbranded case, but that case, they prevailed in that case because they didn't plead it properly. Well, are you saying this is a footnote 4 case or not? I'm saying sure it is. Oh, you're saying it is. At the end of footnote 4, it goes on. I was just going to ask you. Pardon? I'm sorry. I was just going to ask you. You were talking earlier about the beginning of footnote 4 where it says we don't address state-designed claims that parallel federal misbranded states, but at the end of footnote 4 it says the parties in the government appear to agree that a drug is misbranded under federal law only when liability is based on new scientifically significant information that was not before the FDA. So how does that dovetail into your argument? Well, clearly there was information that wasn't before the FDA. First they said they allowed it, and then they changed their position. Wasn't there information before them exactly like this? There was already. There was already? The drug had already been pulled in parts of Europe in 2005 or 2006, and then in 2009 Great Britain stopped the sale of this. And wasn't there information before the FDA then indicating that the drug was unsafe and shouldn't be sold at all? There was. So then how do you explain, you know, are you taking part of the footnote but saying the other part doesn't apply? No. There's obviously new information that came to them. That's why they changed their position. Plus, if you go back to Levine, which I skipped over because I wanted to get to what appeared to interest the court more. Can you explain Levine to us? Pardon? Can you explain Levine to us? I can explain it, sure. In Levine, Justice John Paul Stevens clearly lays out the limits of preemption. And that case, even in the later cases, they called that the cornerstone, that decision. And there he says you engage every presumption there is against preemption. And he also says the state enforcement of drug laws is critical to the health, to the whole drug regulation scheme. And that there was no intention on Congress, on the part of Congress, to ever limit or control state enforcement of the drug scheme. And insofar as new information is concerned, the point he makes there, new information doesn't have to be new information. New information doesn't have to be new evidence. It can be a different analysis of the old evidence. And so what the FDA did in 2010, and they were obviously starting the process when this point where Saul was taking this drug, when they started that process, they were either analyzing the old information, putting a new understanding on the old information, or they had new information. But obviously they had to say there was something new there. Well, how do you contest counsel's suggestion that footnote 4 is relating only to an absolute liability scenario? That's not what the Sixth Circuit suggested. And I don't see any suggestion to that. And it doesn't square with Justice Alito's limitation that he put on their opinion. He said our holding is limited to this holding that we are writing today. And remember, he's answering the hammering that he's getting from Sotomayor. The limits that we're opposing today only apply to situations where the state places a duty on a manufacturer to render a drug safer by either altering its composition or altering its labeling. And this complaint doesn't ask that it alter its composition or alter its labeling. In fact, the complaint doesn't even mention labeling. Well, are you saying that even though the briefs argued this very position, that your position isn't at all what the plaintiffs argued in the Bartlett brief? It's very different. Yes, Your Honor. In some respects it's similar. Of course it is. Well, before you argue initially that before Bartlett, the First Circuit was reversed, that your case was identical or on a course to Bartlett, well, how do you square that with everything? It wasn't after Bartlett, but the Supreme Court said this is our view of preemption. We had made adjustments, which every competent lawyer does every day. We were adjusting to the realities of the situation at that time. A few other points, and I think, like I said- Could you amend your complaint, or should you be allowed to amend your complaint, with new information if it's out there? Yes. I hope it's clear that we are not limiting to our case with footnote four. I think Justice Palmer summarized our position. The position is footnote three. There's nothing that would save this trial. There is nothing that saves this trial. Labeling, design, nothing. And you understand you have the right to amend even before the appellate court? Yes, of course. A couple of final points. Mr. Lefkowitz mentioned that every court agreed with their position. Almost all the cases are not like this for drugs, as Justice McBride pointed out, that are still on the market, that are still approved by the FDA. This is the only one that's so bad that- Well, are there any other cases, then, that you could direct us to where the complaint alleges what you believe you're alleging, and that is that we're not asking for a change in the composition. We're not suggesting a warning would have assisted. We're saying that this drug should never have been sold at any time, and, therefore, state's cause of action post. I think that the Jarvisett Court says that's a Sixth Circuit case. The other case I would say is I suggest to the court to read Hassett v. DeVoe. Which is cited in the brief. Which is discussed by the Sixth Circuit case. And Mr. Lefkowitz said every case ever, he won. But that one he lost. And it is cited in his brief. Is that a state court case? It's a public court from Pennsylvania. Yes. All right. And then there's another- And the site on Hassett is 74A3-203. It's not in the brief.  No, it's not in our brief. It's discussed in the Sixth Circuit case. But it's the appellate court in Pennsylvania. And the appellate court there says that the federal cases that they cite there are not persuasive. And that the allegation that even if used as labeled, the drug is defective, is not inconsistent with federal law. Which is basically what we're saying. This is a defective drug and a cause of action under these circumstances is not inconsistent with federal law. There's nothing in the path between a plaintiff and a judgment in this case that in any way interferes with federal law. I would just say, Mensing and Bartlett, do not grant the blanket immunity that the defendants argue. And I would respectfully suggest that you answer the questions posed by the circuit court known. Thank you very much. I may just take about three minutes to address a few discreet points. Number one, as the footnote for in the Sixth Circuit opinion, the Sixth Circuit at page 929 explains the genesis of that footnote very clearly. And points out that the FDA and the Solicitor General had made it clear that they applied only in the context of pure design defect claims. And then the Sixth Circuit did not say that those types of claims do exist. It says, we have made to address page 921 of the Sixth Circuit. And it simply says, after explaining that it only even is positive in the context of pure design defect claims. And even then, only when there's an allegation of new information, it says, this possibly foreign issue need not be resolved today. Because even if such a claim exists, they fail here. So they weren't acknowledging it exists. That's point one. Point two, counsel mentioned WIAS. And WIAS is a very different case. Because what WIAS was addressing was whether there could be state tort law liability against a brand manufacturer for not strengthening a label. And the dispositive feature in the WIAS case is that there's actually a federal regulation on points relating to something called the CBE, change being affected. That explicitly authorizes a brand manufacturer to strengthen a warning. And what the Supreme Court simply said is, there can't be preemption if federal law allows the brand company to do what state law is saying they should have done. Because there's no conflict. There's actually harmony between the two. To the extent that the court in WIAS talked about a presumption against preemption, I would simply note that in the last two cases on preemption, the court didn't address any presumption at all. Two last points. Your Honor, Judge Justice Ford, you asked me whether when I was reading from the Bartlett brief, it was cited in the record. We cite it in our reply brief at page three. It's also obviously available publicly at 2013 Westlaw 602-909. The last two points I want to make are, number one, with respect to Justice McBride's questions about the sufficiency of the question certified. And I apologize. I was not trial counsel below, so I only saw these at the appellate stage. And I didn't mean to suggest that the other side actually has to be. But as framed, all of these questions do address Illinois law specifically. And since we know that Illinois law is not this pure design defect or this absolute liability regime, I actually think that unless it's somehow counter to the rules of this court, the questions can be answered as a matter of law. Because we know that sufficiency of warnings is an inherent component of an unreasonably dangerous fine. So why are you telling us that it would not be an advisory opinion? I don't believe it would be an advisory opinion because I think it would address the contention made below. In the complaint, they bring all of these causes of action under Illinois law. And it would help the trial court and it would help the parties. I think it would help the trial court all over the state. Let me ask you this. What is the point of us basically regurgitating what the Supreme Court said in those two cases? If we limit it to whether a case involving an insufficiency of a warning survives, I think the question is no, it doesn't survive. Does a case where the plaintiff is asking to change the composition, the answer would be no. What's the point of us telling the lawyers what kind of a complaint could withstand? That's not what I'm suggesting. What I'm suggesting is there have been, I believe, two cases in Illinois. It's only important whether or not this particular complaint could survive. I mean, otherwise, what are we doing? That is true. But in answering this question, I think what this court will do is clarify what I believe should have been self-evident and what was evident in the first lower court Illinois case to address this issue, but evidently was not evident to this trial judge, which is that the response of just take the drug off the market is not a sufficient answer to preemption because, as the Supreme Court said, that's incoherent because, quote, in every instance in which the court has found preemption, the direct conflict between federal and state law could easily have been avoided if the regulated actor had ceased acting. That is, in a sense, the nutshell here. I don't think anyone needs clarity that there's preemption as to a divine change or a warning change. I think what the lower court … What is this rare case in which state or federal law actually requires a product to be pulled from the market? Well, if you … Because is there any doubt here that a product that is unreasonably dangerous, in other words, it doesn't matter what the warnings say, it doesn't matter, you know, the composition is completely not really significant, but you can't make it safe. I think the rare case would be one of two scenarios. And, again, Justice Breyer, in footnote three, which is what you're … So what is different? In my case, A, if the FDA bans a product and then someone goes out and sells the product … But is that really … isn't there a scenario where the FDA permitted a drug to be sold when, in fact, it never should have in the first instance? No, you're … You don't think that exists? In other words, that there aren't drug … I mean, this … I think that … I think that's where … Right. Even though it's post this lawsuit … I don't think there's any reported case anywhere that countenances second-guessing of the Food and Drug Administration's actual decision. What was theorized by the government in their brief in the Bartlett case was, A, a pure design defect jurisdiction. Absolutely. It had a little bit of liability, which it acknowledged doesn't exist, and certainly, for purposes of this argument, is not the case in Illinois. And then … And we shouldn't be expounding upon that. Correct. And then, what the government said in its brief was, even in a pure design defect plan, even if New Hampshire provided for one, it would still be preemptive, if not based on new scientifically significant evidence. So you … Shouldn't they be allowed to go back and amend them? Because … The court allows this complaint to go forward, and then the questions propounded are, I don't know, is there any viable action? They should not be allowed to amend, because they would first have to amend Illinois law. In other words, it's not sufficient to just allege new information. You have to allege new information against a state law that is an absolute liability regime. And without going back, if the legislature here were to change the law, and then someone were to bring a case and, under that new law, raise new information and factually identify what that new information was that they said the FDA didn't have, then we would at least have a debate over whether a footnote or countenance is something or not. I would argue, for reasons you don't have to go into here, that it's still not a viable cause of action. The Fifth Circuit says we don't even have to speculate about that. But aren't there a couple of state court cases from Pennsylvania that suggest that there are exceptions after Bartlett and then … No. The cases that have allowed certain types of causes of action have related to a discrete issue where a generic company has not updated a warning when the federal law has changed the warning. Now, that certainly is not an issue here. Correct. And there's no reason for us to give an opinion that that cause of action exists. Is there? No. Not at all. What's your B? You said there's an A and a B. I'll bring you back to that. With regard to the rear cases, the A, the FDA, the FDA abandoned, what's your B? Oh, the B is there has to be a regime in which there is absolute liability, where you don't have commentators. If you have that and then you have the allegation of new scientific information, then you could at least have a debate about the viability of the FDA's theory. But right now that's not the case. All right. I want to go to where Mr. Ford was speaking to us about Justice Alito's answer to the dissent, where he says, the dissent accuses us of incorrectly assuming that federal law gives pharmaceutical companies a right to sell a federally approved drug free from common law liability. And he goes on to say, rather, we hold that state law design defect claims like New Hampshire's that place a duty on manufacturers to make drugs safer. I'm paraphrasing. I'm sorry. I'm reading from. I want to follow along if I may. Well, this is right after Roman numeral five, right after footnote five. And I'm looking for a page site. Okay. I'm with you now. Okay. The dissent accuses us of incorrectly assuming. Are you with me? Yeah. Okay. So, you know, by either the duty to either alter the composition or alter the labeling. Okay. And the dissent is quite correct that federal law establishes no safe harbor for drug companies. But it does prevent them from taking certain remedial measures. Now, my understanding of the plaintiff's argument here is it falls right in this paragraph. And what they're saying is, hey, there's no safe harbor. You can't always get away with this. It's just when, you know, we would have been required to alter our label or alter our design, which we couldn't do under federal law. But there's no safe harbor. Where state law imposes a duty to take such remedial measures, that conflicts with federal law. But they're not saying that that's what should have been done. They're not saying you should have changed the label. Well, I think what they're saying is that there was no label you could come up with that would have saved the plaintiff. And, therefore, you should have pulled it. And that is precisely what the entire opinion addresses. The opinion in Barclay, Your Honor. Well, where is this lack of a safe harbor then? My question is, when he says there's no safe harbor, okay, it seems to me that your argument is that there is a safe harbor. So how do you get out of the harbor? He dropped the footnote to hypothesize that you might get out of the harbor in a type of jurisdiction where there was pure design defect, where there was new information, then maybe there wouldn't be a safe harbor. Maybe then, hypothetically, although he doesn't say that there is such a claim, maybe there would be some kind of a friendly claim. We don't know from this opinion. What we do know, though, is that if the state cause of action says what you shouldn't be doing is selling this drug, it's just not safe, that is preemptive. And in fact, he not only says the incoherence of the stop-selling theory becomes plain when viewed through the lens of our previous cases. In every instance where we found preemption, you could have avoided the conflict by taking the drug off the market. He then responded to Justice Barclay. But have any of those cases involved disallegation? And those cases have to do with, well, you should have strengthened the label. Are any of those cases that he's referring to, that the justice is referring to, that situation where there's just no way to make it safe and no way to label it safely? Yes. Barclay himself said, and I couldn't be more clear, the argument that Justice Barclay has made, and I'll just close with this, where liability is imposed on the state law for selling an unreasonably dangerous drug that cannot be improved through a different design or label. In other words, we stipulate it can't be improved. Then a manufacturer's decision to remove the product doesn't conflict with any federal law and should not be preemptive. That was the entire premise that was teed up at the Supreme Court. And the Supreme Court said, even when you have this drug selling back, that can't be made safe over the label change, can't be made different. And the only thing the state is saying is you should stop selling the drug. And then you avoid liability. And clearly, there's nothing preventing you from just pulling it off the shelf. That is preemptive. That's what the Barclay case says. Thank you, Your Honor. Thank you, Your Honor. This Court wishes to sincerely thank counsel for each party for their excellent presentations today and for their excellent briefing. It's obviously a fascinating case and an important case. And we will give it our due consideration and take it under advisement. Thank you very much. This Court is adjourned. Thank you.